UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                                     :
ELIZABETH ROBB BICE, et al.,                         :
                                                     :
                    Plaintiffs,                      :
                                                     :
          -against-                                  :
                                                     :
GEORGE E. ROBB, JR.,                                 :
                                                     :
                    Defendant.                       :
-----------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 9, 2012
```

07 Civ. 2214 (PAC)

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

          This family dispute has been litigated for nearly five years.  At the core of this case is an

alleged oral statement made 27 years ago, by and between Defendant George E. Robb, Jr.

("Robb, Jr.") and his father, George E. Robb, Sr. ("Robb, Sr.") that the family business which

Robb, Jr. bought from Robb, Sr. in 1985 would be for the benefit of Plaintiffs and other family

members.  Based on Robb, Jr.'s alleged promise, which is supported only by hearsay, Plaintiffs

claim that they are entitled to a meaningful share of profits from Robb Jr.'s sale of the business

in March 2001.  They assert claims for breach of contract, constructive trust, and unjust

enrichment.

          On February 29, 2008, the Court dismissed this matter on statute of limitations grounds.

See Bice, et al. v. Robb, No. 07 Civ. 2214, 2008 WL 552566 (S.D.N.Y. Feb. 29, 2008).  The

Second Circuit vacated this Court's order of dismissal and remanded for further proceedings, but

noted that its remand "does not preclude the district court from adjudicating the motion to

dismiss on the ground that the alleged promise is too vague to be enforced."  Bice, et al. v. Robb,

324 Fed. Appx. 79, 81 (2d Cir. 2009).[1]  Plaintiffs subsequently filed their First Amended Complaint ("Amended Complaint") on May 22, 2009, and Robb, Jr. moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on vagueness and other grounds.  On January 15, 2010, the Court denied Robb, Jr.'s motion, holding that it was premature to dismiss Plaintiffs' breach of contract claim without discovery.  Bice, et al. v. Robb, No. 07 Civ. 2214(PAC) (S.D.N.Y. Jan. 15, 2010) (Dkt. # 41) ("January 15, 2010 Order").  As the Court explained, "[d]iscovery might shed light on how Robb, Sr. ran the business for the benefit of his family and thus flesh out the terms of the promise."  (Id. at 7-8.)  Having conducted extensive discovery, Defendant now moves for summary judgment.  For the reasons discussed below, the Court grants Defendant's motion. Plaintiffs' claims are therefore dismissed with prejudice.

## BACKGROUND

The Court assumes the parties' familiarity with the background facts, procedural history, and allegations as stated in prior opinions, including the Second Circuit's opinion.  Briefly, four siblings sued their brother, Robb, Jr., who bought the family business, RPM Securities, Inc.[2] ("RPM"), from their father and his associates through a leveraged buy-out ("LBO") in 1985. Shortly before the LBO, according to the four siblings, Robb, Jr. told his father that he would "take care of family always."  (Def's 56.1 ¶ 1; Pl's 56.1 ¶ 1(c).)  After the LBO, the company continued to grow for more than a decade, and Robb, Jr. subsequently sold the business in 2001 to another NYSE specialist firm, LaBranche & Co., Inc. ("LaBranche"), at a large profit.

---

[1] The initial complaint alleged that "[a]lmost immediately upon assuming control of the company," Robb, Jr. failed to live up to his statements to his father about taking care of the family.  (Compl. ¶¶ 21-22.)  The Court held that, based on those allegations, the statute of limitations on Plaintiffs' claim for a constructive trust began to run in 1985. See Bice, et al. v. Robb, 2008 WL 552566, at *3-4.  Upon appeal, Plaintiffs convinced the Second Circuit that the statute of limitations should not begin to run until Robb, Jr. sold the company in 2001.  See Bice, et al. v. Robb, 324 Fed. Appx. at 81.  In their First Amended Complaint, Plaintiffs clarified that "taking care of the family" meant distributing a portion of the proceeds of the 2001 sale to Robb, Jr.'s siblings.

[2] RPM was a New York Stock Exchange ("NYSE") specialist firm that served as a market maker on the NYSE trading floor.  The company also provided clearing services for stock trades and engaged in proprietary trading. (Def's 56.1 ¶¶ 7-8.)

Plaintiffs assert that Robb Jr. received $180 million from LaBranche's acquisition of RPM, but that he did not "take care of the family" by giving them each a meaningful distribution of these proceeds.

1. Robb, Sr.'s Operation of RPM

Plaintiffs contend that Robb, Sr. ran RPM as a family firm and that he wished to "keep it in the family." (Pl's 56.1 ¶¶16(b), 25.) Robb, Sr. was only one of RPM's principals, however. Throughout his time at RPM, Robb, Sr. employed many family members, even those who had no financial experience. (Id. ¶ 240.) In approximately 1978, Robb, Sr. gave RPM stock in equal amounts to each of his children. (Id. ¶ 242.) In subsequent years, Robb, Sr. increased his children's holdings in RPM and gave more shares to Robb, Jr. because he was the eldest. (Id. ¶ 245.) Plaintiffs argue that Robb, Sr.'s 1983 Will confirms that Robb, Sr. wanted to maintain RPM as a family business and provide for his children's financial security by giving them equal shares of RPM stock. (Id. ¶¶ 219, 279, 280.) Plaintiffs further contend that in 1984, after Robb, Sr. decided to leave RPM, he approached his brother John about running the company. (Id. ¶ 296.) John declined, and in 1985, Robb, Sr. discussed transferring his controlling interest in the company to Robb, Jr. (Id. ¶¶ 297, 301.)

2. Alleged Oral Promise

Clare Robb, Robb, Sr.'s wife, testified in her deposition that at some point prior to the LBO, she heard her husband speaking to Robb, Jr. on the telephone. (Declaration of Laura Flahive Wu ("Wu Decl."), Ex. 5, at 24:5-19.) She testified that during this conversation, Robb, Sr. told Robb, Jr. "to keep it in – just keep it in the family."[3] (Id. at 25:4-5.) What Robb, Jr. said

---

[3] Clare Robb was "not sure" about her vague recollection of Robb, Sr.'s precise words, but that "it was something to that effect that it's to keep it in the family, take care of family, saying that a few times." (Wu Decl., Ex. 5, at 25:23-25.) After her husband died in 1991, she told Robb, Jr. on several occasions that he was not living up to his promise to Robb, Sr. (Id. at 37:2-15.) Clare Robb could not remember whether she specifically referred to Robb, Jr.'s

is not known; Clare Robb could not hear Robb, Jr.'s response.  She testified that she understood Robb, Sr. to be referring to RPM and thought that Robb, Jr. agreed to her husband's request.  (Id. at 26:2-8; 27:9-12.)  Clare Robb further testified that after the LBO, Robb, Sr. told her that he chose to sell RPM to Robb, Jr. rather than other bidders "[b]ecause he wanted to keep it in the family."  (Id. at 41:17-21.)

According to Plaintiffs, Robb, Jr. acknowledged this oral agreement during multiple conversations with family members, specifically: a January 4, 2007 conversation with his sister, Plaintiff Barbara Robb, (Def's 56.1 ¶ 217; Pl's 56.1 ¶ 217); a January 11, 2007 conversation with his sister, Plaintiff Clare Robb Wenk, (Wu Decl., Ex. 3, at 87:2-15); and during various conversations with Robb, Sr.'s brother, James Robb.  (Pl's 56.1 ¶ 50.)  The record further shows that after the 2001 sale of RPM to LaBranche, Robb, Jr. created and funded GR Family LLC using part of his proceeds from the transaction in order to benefit his siblings.  (Def's 56.1 ¶ 157.)  Plaintiffs argue that these measures show that Robb, Jr. acknowledged his oral agreement with Robb, Sr.

Defendant maintains that he did not create GR Family LLC to fulfill any obligation to Robb, Sr., but rather "[t]o try to create a nest egg for some of my siblings and children."  (Id.)  Elizabeth Robb Bice expressed a similar understanding in an email to Barbara Robb dated November 30, 2006.  (Wu Decl., Ex. 40 ("I did believe he was going to give it to us as a 'nest egg' for each of our retirements.").)

Plaintiffs also argue that a September 4, 1985 memorandum from Robb, Sr. regarding the LBO suggests that Robb, Sr. rejected other offers for RPM in favor of Robb, Jr.'s bid.  The memorandum states that Robb, Sr. received a separate all-cash offer of "at least equal to

---

alleged promise to use RPM for the benefit of the family.  As she testified, "I'm not sure.  I think I – I think I told him he wasn't taking care of family, but I'm not sure."  (Id. at 37:21-23.)

$35,000,000," but that RPM terminated those negotiations.  (Wu Decl., Ex. 19.)  The memorandum also states that RPM held "serious negotiations" with another group for the sale of RPM "at a purchase price of at least $35,000,000," but that "the leveraged buy-out proposed by George E. Robb, Jr. and certain other minority shareholders appeared more beneficial to RPM." (Id.)  Plaintiffs contend that Robb, Sr. accepted Robb, Jr.'s bid for the company in reliance on Robb, Jr.'s alleged promise "to fulfill his father's wishes to keep RPM in the family and use it to provide financial security to his children, by, among other things, distributing proceeds of a future sale equally to his children."  (Pl's Mem. at 9.)  Neither Robb, Sr. nor Robb, Jr. ever uttered any words concerning "future sale" or "distributing proceeds of a future sale," however. Those words are strictly Plaintiffs' claims.

Defendant asserts that the record fails to show any evidence of an oral agreement with Robb, Sr., or that Robb, Sr. intended to preserve an interest in RPM for his family at the time of the LBO.  Rather, Defendant maintains that Robb, Sr. began to seek bids for RPM from competing Wall Street firms 18 months before the LBO.  RPM engaged Bear Sterns as its investment advisor to assist in negotiations with a retail brokerage firm.  (Def's 56.1 ¶¶ 30-31.) Robb, Jr. ultimately developed an LBO proposal with the assistance of Merrill Lynch purporting to value the company at $35.6 million and providing $10 million to Robb, Sr.  (Id. ¶¶ 37, 39, 42.)

Defendant maintains that the record shows an arms-length transaction in which he received no special consideration from RPM in the bidding process.  Richard Brodrick, a lawyer who was involved in assembling the terms of the LBO, confirmed at his deposition that the senior managers of RPM were not willing to accept a lower bid for the company simply because the buyer was Robb, Sr.'s son.  (Wu Decl., Ex. 2, at 170:16-171:4.)  RPM's senior management wanted to recover the highest value possible for the firm, as did Robb, Sr.  Robb, Jr. testified at

his deposition that when his father learned that he was assembling a bid, "communication between me and my father ceased" to prevent potential conflicts in the deal.  (Def's 56.1 ¶ 50.)  At the closing, the terms of the LBO were codified in a Stock Purchase Agreement ("SPA").  The SPA included an entire agreement clause which nullified any "previous written or oral negotiations, commitments, representations and agreements."  (Wu Decl., Ex. 18, at R0000920.)  Robb, Sr. received a cash payment of $9,559,574 for his common and preferred stock in RPM, net of set-offs.  (Def's 56.1 ¶ 101.)  Robb, Sr. gave no instructions to share these proceeds with other family members, and his estate reported no rights or interest in the post-LBO RPM, or gifts to his children.  (Id. ¶¶ 136, 138; Pl's 56.1 ¶¶ 136, 138.)  Although Robb, Sr. established a Clifford Trust in 1980 with shares of RPM second preferred stock naming five of his children as beneficiaries, Robb, Sr. sold these shares at the time of the LBO and his children never received the proceeds of that sale.  (Def's 56.1 ¶¶ 109, 114; Pl's 56.1 ¶ 114.)

Defendant contends that the deposition testimony of Robb, Sr.'s wife, Clare Robb, fails to corroborate any oral agreement between Robb, Sr. and Robb, Jr.  Clare Robb testified that she never heard Robb, Sr. mention any promise made by Robb, Jr. in connection with RPM; as she stated, "I think it was just understood."  (Wu Decl., Ex. 5, at 29:9-19.)  Clare Robb also testified that after the LBO, during the last six years of her husband's life, she never heard him tell Robb, Jr. to put RPM stock in Robb, Jr.'s siblings' names.  (Id. at 29:20-30:5.)  Nor did Robb, Jr. ever tell his mother that he promised Robb, Sr. to run RPM for the benefit of the family.  (Id. 42:18-43:8.)  Robb, Sr.'s brother, children, and lawyer each testified that Robb, Sr. never told them of the asserted promise.  (Wu Decl., Ex. 1, Barbara Robb Dep. Tr. at 42:21-49:9; Ex. 2, R. Brodrick Dep. Tr. at 154:9-23; Ex. 3, C. Robb Wenk Dep. Tr. at 94:15-97:24; Ex. 6, Edward Robb Dep.

Tr. at 118:18-119:20; Ex. 7, E. Robb Bice Dep. Tr. at 135:7-22; Ex. 9, James Robb Dep. Tr. at

139:22-141:19; Ex. 10, John Robb Dep. Tr. at 94:9-13.)

Defendant also contests that in subsequent conversations with his siblings he ever

admitted making the alleged promise to Robb, Sr.  Notes taken by Barbara Robb during her

January 4, 2007 call with Robb, Jr.[4] quote Robb, Jr. as stating, "I will always help my family."

(Wu Decl., Ex. 72.)  Following this call, on January 5, 2007, Barbara wrote an email to her

future co-plaintiffs Edward Robb, Elizabeth Robb Bice, Clare Robb Wenk, and other siblings to

assess the strength of their legal claim against Robb, Jr.  As she stated:

> The evidence shows that Dad [Robb, Sr.] was largely enticed to sell to George
> [Robb, Jr.] because he got the best price from George – we have no evidence that
> Dad turned down a better price to sell to George.  "Take care of family" was said
> (at some point), but the evidence does not show that that was the crux of Dad's
> motivation to sell to George.

(Wu Decl., Ex. 37.)  Barbara Robb concluded that the Plaintiffs' situation was

"inequitable . . . but that does not mean we have a legal claim."  (Id.)

## DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed.R.Civ.P. 56(c).  A fact is material if it "might affect the outcome of the suit under

governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party

bears the initial burden of producing evidence on each material element of its claim or defense

demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at

---

[4] According to Defendant, these notes were not produced by Plaintiffs until after Barbara Robb's deposition.  (Def's
56.1 ¶ 218.)

trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted), but must instead present specific admissible evidence in support of its contention that there is a genuine dispute as to material facts. Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id.

B.   Breach of Contract

To state a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation omitted).

New York law recognizes the freedom of parties to enter into binding oral contracts. Winston v. Mediafare Entmt. Corp., 777 F.2d 78, 80 (2d Cir. 1985). The terms of an alleged contract must be set forth with enough clarity to enable the court to discern the parties' agreement with reasonable certainty. Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109 (1981) "[D]efiniteness as to material matters is the very essence of contract

law."  If the rule were otherwise, "a court, in intervening, would be imposing its own conception

of what the parties should or might have undertaken, rather than confining itself to the

implementation of a bargain to which [the parties] have mutually committed themselves."  Id.

New York courts hesitate to find a contract void for indefiniteness in order to avoid injustice to

the parties.  166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91 (1991);

see also Schumacher, 52 N.Y.2d at 110 (embracing "the maxim that what can be made certain is

certain").  A court should endeavor to hold the parties to their bargain "where it is clear from the

language of the agreement that the parties intended to be bound and there exists an objective

method for supplying a missing term."  Mamaroneck, 78 N.Y.2d at 91; see also Cobble Hill

Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (N.Y. 1989) ("Before

rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be

rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear.").

 Without objective means to clarify the terms of the agreement, a promise to "take care of

family" is void for vagueness and cannot withstand a motion for summary judgment.  See

Lowinger v. Lowinger, 287 A.D.2d 39, 45-46, 733 N.Y.S.2d 33, 38-39 (N.Y. App. Div. 1st

Dep't 2001) (affirming grant of summary judgment finding oral promises to support children too

vague to be enforced); Saunder v. Baryshnikov, 487 N.Y.S.2d 51, 52 (N.Y. App. Div. 1st Dep't

1985) (affirming summary judgment finding oral promise to "take care of [plaintiff] and her

financial needs for the rest of her life" unenforceable where "the vagueness as to material details

(form, frequency and amount of payment) render the assertion of a contract meaningless");

Trimmer v. Van Bomel, 434 N.Y.S.2d 82, 86, 107 Misc.2d 201, 208 (Sup. Ct. New York Cty.

1980) (granting summary judgment and concluding defendant's promise to "take care of"

plaintiff "too vague to spell out a meaningful promise").

The Court assumes for purposes of this motion that prior to the LBO in 1985, Robb, Sr. asked Defendant to "take care of family" or "keep it in the family," and that Robb, Jr. agreed to do so (even though there is no competent proof of such statements by either Robb, Sr. or Jr.). But this "wish" or "hope" does not amount to a contractual obligation.  After extensive discovery, there is no proof that Robb, Jr.'s purported statement in 1985 (if made) created a legally enforceable obligation to share with Plaintiffs the proceeds of the sale of RPM to LaBranche, sixteen years later in 2001.

Rather, the record indicates that Robb, Sr. gave various family members jobs at RPM, regardless of whether they were qualified.  When Robb, Sr. and RPM management decided to sell their interests in the company in 1985, they engaged experienced counsel and accepted Robb, Jr.'s bid for RPM in an arms-length, cash transaction with no written side agreements. Robb, Sr. received approximately $10 million for his shares of RPM, and he gave no instructions to share these proceeds with other family members; nor did he himself distribute any of the proceeds to other family members.  His estate reported no rights or interest in the post-LBO RPM, or gifts to his children.  Although he established a Clifford Trust in 1980 naming his children as beneficiaries of certain RPM shares, this trust was liquidated during the LBO.  These facts do not objectively show that the asserted statements, however phrased, obligated Robb, Jr. to run RPM for his family members' benefit or to distribute the proceeds of the 2001 sale of the company, as Plaintiffs contend.

In response to Defendant's vagueness argument, Plaintiffs cite Robb, Sr.'s 1983 Will and his three prior wills as evidence of Robb, Sr.'s objective intent to use his RPM stock "for the equal financial benefit of all of his children."  (Pl's 56.1 ¶¶ 219, 279.)  These statements say nothing about what Robb, Sr. and Jr. may have discussed or agreed to in 1985.  Moreover, as

Defendant observes, Robb, Sr. sold all of his holdings in RPM at the time of the LBO—including those placed in the Clifford Trust which named his children as beneficiaries.  (Def's Response to Pl's 56.1 ¶¶ 268-292.) To the extent that Robb, Sr.'s 1983 Will suggest a contradictory intent, his final will, dated September 24, 1991, revoked all prior wills and bequeathed his entire estate to his wife.  (Wu Decl., Ex. 38, at R0008857-8859.)  Moreover, Clare Robb, the only family member who overheard her husband tell Robb, Jr. to "keep [RPM] in the family," testified that she never heard Robb, Sr. mention any promise Robb, Jr. made  in connection with RPM.  (Wu Decl., Ex. 5, at 29:9-19.)  As she stated, "I think it was just understood."  Id.  This is pure speculation and it cannot defeat summary judgment.  Niagara Mohawk Power Corp., 315 F.3d at 175.  As Plaintiffs fail to provide objective evidence illuminating what the asserted promise to "take care of family" meant, the Court cannot find that an enforceable contract exists.  Schumacher, 52 N.Y.2d at 109; Cobble Hill, 74 N.Y.2d at 483.  Plaintiffs' breach of contract claim is therefore dismissed with prejudice.

C.   Constructive Trust

"Under New York law, the equitable remedy of a constructive trust is appropriate where there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment."  Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 380 F.3d 624, 646 (2d Cir. 2004).  Notwithstanding these factors, "[t]he fourth element is the most important since the purpose of the constructive trust is prevention of unjust enrichment."  In re First Cent. Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004) (internal quotation omitted).

Plaintiffs contend that Robb, Jr. had "a confidential and fiduciary relationship with his father" in part because Robb, Sr. groomed his son to run RPM for the benefit of the Robb family, and because Robb, Jr. was named as trustee of the trusts holding RPM stock for his siblings' benefit.  (Pl.'s Mem. at 12.)  Although a family relationship may satisfy the first element for a constructive trust, see Brand v. Brand, 811 F.2d 74, 78 (2d Cir. 1978), no such fiduciary relationship exists in this case, where Robb, Sr. sold his RPM shares in an arm's length commercial transaction.  See In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) ("[W]hen parties deal at arms length in a commercial transaction, no relationship of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (internal quotation omitted).

Moreover, for the reasons already discussed, on this record, Robb, Jr.'s asserted promise to "take care of family" falls miles short of a request to distribute evenly the sale proceeds from the 2001 RPM transaction to Plaintiffs.  Robb, Sr. did not do this with the proceeds he earned from an arms-length transaction in 1985, and it would be anomalous to require Robb, Jr. to do in 2012 what the father chose not to do over 25 years ago.  In any event, Robb, Jr. funded GR Family LLC with proceeds from that sale, the record suggests that he did so "[t]o try to create a nest egg for some of my siblings and children," and not out of any obligation to his father. (Def's 56.1 ¶ 157.)  Defendant's sister, Plaintiff Elizabeth Robb Bice, confirmed this view in an email to Barbara Robb, dated November 30, 2006, in which she stated: "I always believed that George stated he would give us something in the future for retirement, but when and how much was always missing from the discussions."  (Wu Decl., Ex. 40.)  The record shows neither an express or implied promise from Robb, Jr. to distribute funds from the sale of the company.  Accordingly, Plaintiffs' claim for a constructive trust is dismissed with prejudice.

12

D.   Unjust Enrichment

To prevail on a claim for unjust enrichment under New York law, "a party must show that (1) the other party was enriched; (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Old Republic Nat'l Title Ins. Co. v. Luft, 859 N.Y.S.2d 261, 262 (N.Y. App. Div. 2d Dep't 2008). Plaintiffs contend that it would be "the epitome of 'unjust enrichment'" to allow Robb, Jr. to retain the proceeds of the 2001 sale of RPM in light of his alleged agreement to use RPM "for the benefit of his siblings and himself." (Pl's Mem. at 26.)  Here again, the record fails to show a genuine issue of material fact on Plaintiffs' claim.  In 1985, Robb, Jr. raised and made a $35 million bid for RPM with the assistance of Merrill Lynch.  RPM management considered and accepted the bid, and Robb, Sr. sold his interest in the company in an arms-length transaction with counsel on both sides.  Plaintiffs did not provide any funding for the transaction. Subsequently, the value of RPM increased, and Robb Jr. earned a profit when he sold the firm in 2001.  As Barbara Robb concedes:

> The evidence shows that Dad [Robb, Sr.] was largely enticed to sell to George [Robb, Jr.] because he got the best price from George – we have no evidence that Dad turned down a better price to sell to George.  "Take care of family" was said (at some point), but the evidence does not show that that was the crux of Dad's motivation to sell to George.

(Wu Decl., Ex. 37.)  In light of the record, Plaintiffs fail to raise a genuine issue of fact as to how Robb, Jr. was unjustly enriched.  See Kastrat v. Wynnykin, 788 N.Y.S. 2d 339, 340-41 (N.Y. App. Div. 1st Dep't 2004) (affirming order of summary judgment dismissing unjust enrichment claim against buyer where record established that buyer paid fair market value for property). Plaintiffs' unjust enrichment claim is therefore dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted.

Plaintiffs' claims for breach of contract, constructive trust, and unjust enrichment are dismissed

with prejudice. The Clerk is directed to enter judgment for Defendant and terminate this case.

Dated: New York, New York
     March 9, 2012

SO ORDERED

PAUL A. CROTTY
United States District Judge

14